# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

Roderick J. Rogers,

                    Plaintiff,       Case No. 1:16-cv-01556

v.                              Michael L. Brown
                                      United States District Judge

City of College Park, Georgia, et
al.,

                    Defendants.

_____/

## OPINION & ORDER

City of College Park police officers mistakenly arrested Plaintiff
Roderick Rogers for a crime he did not commit. He sued the individual
officers for malicious prosecution and the City for negligence. While the
case was pending, the City issued him several municipal citations
involving his auto repair business. Plaintiff thus amended his complaint,
adding a claim that the City was retaliating against him in violation of
his First Amendment rights. The individual Defendants moved for
summary judgment, arguing qualified immunity shielded them from any
liability arising from the mistaken arrest. The City moved for summary

judgment on the negligence claim arising from the mistaken arrest and the First Amendment retaliation claim. The Court grants Defendants' motion.

## I. Factual Background

### A. Plaintiff's Wrongful Arrest

In September 2014, non-party Rodrick L. Rodgers ran over Paulette Carter with his car. (Dkt. 17 ¶ 14.) She sought medical treatment at a local hospital. (*Id.* at ¶ 15.) Defendant Officers Silvers and Ferguson went to the hospital to interview her. (*Id.* ¶ 16.) She told them about the assault, said she knew the person who hurt her, and identified him as "Rodrick Rodgers." (*Id.* ¶ 17.) She described him as a "black male in his mid-40s, slender build, around 6'1" or 6'2", and dark-skinned." (Dkts. 59-27 ¶ 3; 68 ¶ 3.) She did not know the suspect's date of birth. (Dkts. 59-27 ¶ 3; 68 ¶ 3.)

Defendant Silvers contends that Ms. Carter also said the man had a business on Riverdale Road. (Dkt. 78 at 25:24–26:2.) Defendant Ferguson "testified that Carter said the man owned an auto shop at the corner of Riverdale Road and Hersel." (Dkt. 59-27 ¶ 5.) Ms. Carter denies saying this. She provided Plaintiff a declaration stating she told

them the man who assaulted her sold t-shirts for a living. (Dkt. 81 ¶ 4.)[1] She claims she never said he owned a business on Riverdale Road. (*Id.*)

After speaking with Ms. Carter at the hospital, Defendants Silvers and Ferguson ran the name "Roderick Rogers" through their RMS software, which the College Park Police Department uses to maintain information about people with whom police officers have contact. (Dkts. 59-27 ¶ 7; 68 ¶ 7.) The system provides basic identifying information like an individual's race, height, and weight, and other details. (Dkts. 59-27 ¶ 6; 68 ¶ 6.) Apparently, the officers did not ask Ms. Carter how to spell her assailant's name. (Dkt. 68 ¶ 3.) In addition, while she said his name was "Rodrick Rodgers," they must have heard it as "Roderick Rogers" as that was the "common spelling" of the name they ran through the system. The record lacks any evidence to suggest Defendants knew they were misspelling Ms. Carter's assailant's name. (*See* Dkt. 78 at 24:19–21 ("I just used the common spelling for Roderick, even though that could be spelled different ways, too.").)

---

[1] Defendants argue that the Court may not consider Ms. Carter's declaration because it does not comply with the Local Rules. While Defendants are correct, the Court elects to consider Carter's declaration.

The RMS system provided information for three people. First, it identified Plaintiff. The system described him as a forty-year-old African-American male from College Park, weighing 205 pounds and standing six feet two inches tall. (Dkt. 59-7 at 2.) Defendant Officers Ferguson and Silvers believed that description of Plaintiff was "spot-on" to Ms. Carter's description of her attacker. (Dkt. 59-27 ¶ 9; 68 ¶ 9.) Second, the system identified Plaintiff's son, who was born in 1990 and nowhere near the age of the person Ms. Carter described. (Dkt. 59-7 at 3.) Third, the system identified a man from Cordele, Georgia, who was six inches shorter and 45 pounds lighter than Plaintiff. (Dkt. 68 ¶ 8.)[2]

As explained above, both Defendant Officers testified that Ms. Carter said the man who assaulted her ran a business or auto repair shop on Riverdale Road. Before the interview with Ms. Carter, Defendant Silvers knew Plaintiff has such a business because Plaintiff had worked

---

[2] Plaintiff disputes Defendants' assertion that these were the only people identified by the RMS system but offers no evidence to support his assertion. His simple denial cannot raise a genuine dispute of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986) (recognizing that nonmoving party must point to "specific facts" and "may not rest upon the mere allegations or denials of his pleading").

on cars for police officers. (Dkt. 78 at 30:10–25.)[3] Defendant Silvers testified that this was an important piece of information to him and "the primary reason" why he believed Plaintiff assaulted Ms. Carter. (*Id.* at 26:8.) Of course, Ms. Carter denies having said this.

While at the hospital, Defendants Ferguson and Silvers concluded Plaintiff had committed the assault. (Dkts. 59-27 ¶ 10; 68 ¶ 10.) They never showed Ms. Carter a photograph of Plaintiff from the RMS system so that she could positively identify him as the man who hurt her. They also never presented her a photographic lineup that included his photo and asked her to identify her attacker. (Dkt. 78 at 32:11–16.) Instead, they returned to the police station to obtain an arrest warrant. (Dkt. 59-27 ¶ 10.)

Defendant Ferguson drafted the incident report and arrest warrant. (Dkts. 59-27 ¶ 13; 68 ¶ 13.) In the arrest warrant, he did not explain how he and Defendant Silvers identified Plaintiff as the assailant. Both Defendant Sergeant Ware and Defendant Patterson reviewed the warrant, with Defendant Ware requesting minor changes.

---

[3] Defendant Silvers was the only Defendant who knew of or knowingly interacted with Plaintiff before this suit. (Dkts. 59-27 ¶ 12; 68 ¶ 12.)

(Dkt. 59-27 ¶¶ 14–15.) Defendants Ferguson and Silvers presented the warrant to a judge and explained what happened and why they believed they had probable cause to arrest Plaintiff. (*Id.* ¶ 18.) A judge signed the arrest warrant. (*Id.* ¶ 19; Dkt. 68 ¶ 19.)[4]

Defendants Silvers and Ferguson arrested Plaintiff at his business on Riverdale Road. (Dkts. 59-27 ¶ 20; 68 ¶¶ 20–21.) They took him to the College Park jail. (Dkts. 59-27 ¶ 20; 68 ¶¶ 20–21.) Law enforcement then transported him to the Fulton County jail. (Dkts. 59-27 ¶ 22; 68 ¶ 22.) The jail held him for about 54 hours before releasing him on bond. (Dkts. 59-27 ¶¶ 23–24; 68 ¶¶ 23–24.)

A few days later, Plaintiff went to the police station and filed a complaint about his wrongful arrest. (Dkts. 59-27 ¶ 31; 68 ¶ 31.) Another officer conducted a follow-up investigation, including showing Ms. Carter a photographic lineup from which she failed to identify Plaintiff. (Dkt. 59-12 at 2.) The officer then ran the name "Rodrick"

---

[4] Plaintiff disputes these facts on the basis that the record is unclear on which particular judge signed the arrest warrant. (Dkt. 68 ¶ 18.) Because Plaintiff does not challenge the sufficiency of the warrant, the identity of the judge who in fact signed it is immaterial to the Court's summary judgment determination on his malicious prosecution claim.

through the RMS system and identified Rodrick Rodgers.  (*Id.* at 3.)  The system described him as a forty-two-year-old African-American man from College Park, weighing 220 pounds and standing six feet four inches tall. Ms. Carter identified him in a photographic lineup as her attacker.  (*Id.*)

## B.    Law Enforcement Drops the Charges

Law enforcement dismissed the charges against Plaintiff.   An internal affairs review later criticized Officer Silvers's and Officer Ferguson's actions.  It found they had "made assumptions without basis" and filed an incomplete report that did not include the description the victim gave of the suspect or explain how they identified the suspect.  (*Id.*) The investigation concluded that "the officers did not show an attention to duty to complete the incident report so that the suspect could have been properly identified."  (*Id.*)

The investigation also concluded that Defendant Ware, as the shift supervisor, did not adequately perform oversight or correct "glaring mistakes if he had reviewed all material associated with this incident." (*Id.*)  The report also concluded that Defendant Patterson "should have questioned the officers on how they arrived at the conclusion of the

suspect, before approving the report," though did not find him in violation of any of the Department's SOPs. (*Id.*)

## C. The Alleged Retaliation

On March 13, 2015, Plaintiff notified the City of College Park that he intended to sue it for damages arising from his false arrest. (Dkts. 59-27 ¶ 34; 68 ¶ 34.) He also claimed the City harassed him repeatedly by issuing several citations to his business because City officials did not like the business and wanted him to move it or close it down. (Dkts. 59-27 ¶ 34; 68 ¶ 34.) Three days later, Plaintiff sued City of College Park and the individual Defendants for false arrest and malicious prosecution. (Dkts. 59-27 ¶ 35; 68 ¶ 35.)

The City claims it received notice of the suit on May 17, 2016, when a private attorney read about it online and notified the City Attorney. (Dkts. 59-27 ¶ 36; 68 ¶ 36.) The City Attorney then forwarded the complaint to the City Manager and the Director of Human Resources and Risk Management. (Dkts. 59-27 ¶ 37; 68 ¶ 37.) Plaintiff presented no evidence raising a genuine issue of material fact to contradict this timeline.

The day after the City Attorney learned of the lawsuit, City Councilman Roderick Gay emailed Alexandria Porter, the City Code Enforcement Officer responsible for the area encompassing Plaintiff's business, about possible code violations at Plaintiff's business. (Dkts. 59-27 ¶ 38; 68 ¶ 38.) Councilman Gay, who lives three blocks from Plaintiff's business and drives by it nearly every day, asked Porter to "please start [the] process to remove storage bin and derelict vehicle at business on Riverdale Drive." (Dkts. 59-27 ¶ 39; 68 ¶ 39.) That afternoon, Porter issued a citation to Plaintiff for a "derelict vehicle." (Dkts. 59-27 ¶ 40; 68 ¶ 40.) The City ultimately dismissed that citation because Porter used a code section not intended for automotive shops like Plaintiff's business but one used in residential or non-automotive commercial locations. (Dkts. 59-27 ¶ 41; 68 ¶ 41.)

Councilman Gay testified that he does not recall the exact date when he first learned of Plaintiff's lawsuit, but that he does "remember it being in [a City Council] executive session." (Dkt. 72 at 71:2–8.) City documents show that the first Executive Session after the City Attorney received notice of the suit occurred on June 6, 2016 — 19 days after Plaintiff's May 18th code citation. (Dkts. 59-27 ¶ 43; 68 ¶ 43.)

Four months later, Karen Banks, a Code Enforcement Officer, issued Plaintiff a citation for storing vehicles longer than fourteen days, a violation of College Park's municipal code. (Dkts. 59-27 ¶ 44; 68 ¶ 44.) She issued him another citation a few days later, this one for working on vehicles outside a service bay. (Dkts. 59-27 ¶ 44; 68 ¶ 44.) She explained that she issued these citations after receiving several complaints. She did not know about Plaintiff's lawsuit against the City at the time. (Dkts. 59-27 ¶ 45; 68 ¶ 45.)

In November 2016, six months after filing his complaint, Plaintiff amended his complaint to add a First Amendment retaliation claim against the City, claiming the City retaliated against him by issuing the municipal citations. (Dkts. 59-27 ¶ 46; 68 ¶ 46.)

## II.     Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case."  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact.  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  A moving party meets this burden merely by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  The movant, however, need not negate the other party's claim.  *Id.* at 323.  In determining whether the moving party has met this burden, a court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion.  *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the movant has adequately supported its motion, the nonmoving party then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a

genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, there is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. The court, however, resolves all reasonable doubts in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Additionally, "[i]t is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

## III. Discussion

In his response brief in opposition to Defendants' motion for summary judgment, Plaintiff voluntarily dismissed five of the eight counts in his amended complaint.[5] All that remains for the Court to

---

[5] Plaintiff voluntarily dismissed Count I (false arrest and false imprisonment claim under § 1983); Count V (state law malicious arrest

consider then is (1) Count II (§ 1983 claim for malicious prosecution); (2) Count III (§ 1983 claim for First Amendment retaliation); and (3) Count IV (state-law claim of negligence against Defendant City of College Park).

## A.    Federal Claims & Qualified Immunity

Defendants argue that qualified immunity protects them from Plaintiff's claims arising under 42 U.S.C. § 1983. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (internal quotation marks omitted). So "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Qualified immunity allows officials "to carry out their discretionary duties without the fear of personal liability or harassing litigation." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). When

---

claim); Count VI (state law malicious prosecution claim); Count VII (claim for punitive damages); and Count VIII (claim for attorneys' fees). (Dkt. 67 at 9 n.4, 23 n.5.)

properly applied, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743 (internal quotation marks omitted).

Qualified immunity may attach only when the officer is "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Grider v. City of Auburn*, 618 F.3d 1240, 1254 n.19 (11th Cir. 2010) (citing *Lee*, 284 F.3d at 1194). A public official acts within the scope of his discretionary authority where the acts complained of were "undertaken pursuant to the performance of his duties and within the scope of his authority." *See Rich v. Dollar,* 841 F.2d 1558, 1564 (11th Cir. 1988). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. The parties agree all individual Defendants acted within the scope of their discretionary authority when arresting Plaintiff. *See, e.g.*, *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016) (holding officers acted within discretionary authority when arresting suspect). Plaintiff, thus, has the burden of showing that qualified immunity is unavailable to Defendants.

The qualified immunity analysis presents two questions: first, whether the allegations taken as true establish the violation of a constitutional right; and second, if so, whether the constitutional right was clearly established when the violation occurred. *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). These distinct questions "do not have to be analyzed sequentially; if the law was not clearly established, [the court] need not decide if the [d]efendants actually violated the [plaintiff's] rights, although [the court is] permitted to do so." *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011).

Plaintiff has the burden of showing Defendants' actions violated a constitutional right and that the right was clearly established at the time of the arrest. *See Gutierrez*, 526 F.3d at 1329.

### 1. Count II – Malicious Prosecution under § 1983

#### a. Constitutional Violation

"To establish a federal malicious prosecution claim under § 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable seizures in addition to the elements of the common law tort of malicious prosecution." *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003) (emphasis omitted). The common law tort of

malicious prosecution requires proof that (1) the defendant instituted or continued a criminal prosecution, (2) the defendant did so with malice and without probable cause, (3) the prosecution ended in the plaintiff's favor, and (4) the plaintiff suffered some injury. *Id.* at 882. The Eleventh Circuit has explained that the "federal law of probable cause — not state law — should determine whether a plaintiff has raised a genuine issue of material fact with respect to a § 1983 malicious prosecution claim." *Id.* at 882 n.17 (quoting *Green v. Montgomery*, 219 F.3d 52, 60 n.2 (2d Cir. 2000)).

When probable cause supports an officer's decision to arrest and prosecute an individual, it bars that individual's later § 1983 claim for malicious prosecution. *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004) (holding probable cause to arrest bars subsequent section 1983 claim for malicious prosecution). An officer has probable cause to arrest "if the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Carter v.*

*Butts Cty.*, 821 F.3d 1310, 1319 (11th Cir. 2016) (internal quotation marks omitted).

But when an officer asserts qualified immunity, the issue is not whether probable cause actually existed. Rather, the issue is whether the officer had "arguable" probable cause. *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018). "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable." *Grider*, 618 F.3d at 1257 (internal quotation marks omitted). Qualified immunity still protects those officers. So an officer is entitled to qualified immunity "where reasonable officers in the same circumstances and possessing the same knowledge as the [defendant] could have believed that probable cause existed to arrest." *Gates*, 884 F.3d at 1298 (internal quotation marks omitted).

Defendants Ferguson and Silvers made an obvious mistake; they arrested an innocent man. But the record establishes theirs was a good-faith mistake and that they had arguable probable cause to arrest Plaintiff.

Defendants Ferguson and Silvers interviewed Ms. Carter. She told them a man named "Rodrick Rodgers" had assaulted her. The Court uses that spelling because Plaintiff used it in his amended complaint and throughout this litigation. But nothing in the record shows Ms. Carter spelled the name for the officers and Plaintiff has provided no evidence to suggest otherwise. (Dkt. 68 ¶ 2.) She simply said the name. (*Id.*) Phonetically, there is little difference between the name "Roderick Rogers" and "Rodrick Rodgers." Just a single syllable, perhaps, depending on the speaker's enunciation. The officers testified that — after hearing Ms. Carter state the name of her assailant — they typed "Roderick Rogers" into the RMS system because that is what they thought she said. (*Id.* ¶ 6.) This testimony provides powerful evidence that Defendant Officers heard the name "Roderick Rogers." Plaintiff makes much out of the different spellings. But the undisputed evidence establishes that Defendants Ferguson and Silvers thought they heard Ms. Carter use Plaintiff's name "Roderick Rogers" and never considered an alternative — but strikingly similar — name.

Ms. Carter also described the man who assaulted her as a "black male in his mid-40s, slender build, around 6'1" or 6'2", and dark-skinned."

When the officers entered Plaintiff's name into their computer system, it identified only three Roderick Rogers, with only his description matching Ms. Carter's description of her assailant. RMS described Plaintiff as a forty-year-old African-American male from College Park, weighing 205 pounds and standing six feet two inches tall — the same race, age, height, and build as Ms. Carter's assailant. The undisputed evidence shows Plaintiff and the perpetrator shared nearly the same name phonetically and nearly the same physical description:

| Characteristic | Plaintiff | Perpetrator |
|---|---|---|
| **Name** | Roderick Rogers | Rodrick Rodgers |
| **Sex** | Male | Male |
| **Race** | African-American | African-American |
| **Year of Birth** | 1974 | 1971 |
| **Height** | 6'2" | 6'4" |
| **Weight** | 205 | 220 |
| **Live/Work City** | College Park | College Park |

Plaintiff claims Defendants Silvers and Ferguson should have verified the spelling of the perpetrator's name, searched multiple spellings, or conducted a photo lineup.

But the qualified immunity analysis does not hold officers to the benefit of hindsight. It looks at what reasonable officers in their shoes could have concluded. A reasonable officer confronted with Ms. Carter's

identification of her assailant by Plaintiff's name (unaware of any mispronunciation, mis-hearing, or misspelling), seeing the description provided by the RMS system for Plaintiff, and knowing that Plaintiff was the only match identified by RMS could have believed probable cause existed to arrest Plaintiff.

Plaintiff claims Defendants Ferguson and Silvers are not entitled to qualified immunity because they failed to conduct a reasonable investigation, specifically by failing to enter alternate spellings of the name "Roderick" and "Rogers" in the RMS system, interview Plaintiff before making the arrest, or conduct a photographic lineup. (Dkt. 92 at 6.) Plaintiff cites a series of cases in which the Eleventh Circuit found officers' investigations so inadequate as to preclude qualified immunity. (*Id.* at 2–6.) Those cases, however, do not impose a "reasonableness" standard that permits a court, after the fact, to parse the adequacy of an officer's investigation with the benefit of hindsight, trying to identify other investigative steps an officer could have (or perhaps should have) taken. Indeed, such an analysis is antithetical to the notion that qualified immunity allows officers to make mistakes, protecting all but knowing violators and the plainly incompetent. Rather, the cases place

clear parameters around the term "reasonable" in the qualified immunity analysis of probable cause.

The Eleventh Circuit, for example, has explained that the "reasonable investigation" requirement means the "officers must investigate objectively and consider all information available to them at the time." *Kingsland*, 382 F.3d at 1229. As part of this, they "may not choose . . . not to obtain easily discoverable facts." *Id.* Likewise, if they know of exculpatory evidence, they may not refuse to investigate it. *Gray v. City of Roswell*, 486 F. App'x 798, 801–02 (11th Cir. 2012).

For example, in *Kingsland*, the plaintiff and a police officer were involved in a car accident, both claiming the other person ran a traffic light. 382 F.3d at 1223. The police arrested her for driving under the influence of alcohol. *Id.* at 1224. When she passed a breathalyzer, they tore up those charging documents and arrested her for driving under the influence of cannabis, claiming they smelled it on her and ordering a urine test. *Id.* Police dismissed that charge some time later when the urine test was negative. *Id.* at 1225.

The plaintiff sued the officers, claiming they manufactured probable cause to arrest her and protect their fellow officer from liability

for the accident. *Id.* In denying qualified immunity, the Eleventh Circuit held that the plaintiff had presented evidence that the officers conducted the investigation in a biased fashion. They asked her no questions at the scene, even though she told them the officer ran the light. *Id.* at 1223. They ignored the fact that she claimed to have suffered a head injury, and after telling her they were taking her to the hospital, arrested her instead. *Id.* at 1230. They changed the basis for her arrest from being under the influence of alcohol to cannabis. *Id.* at 1224. The evidence to support this alternative allegation was weak and made in the complete absence of any investigation. *Id.* at 1233. Two officers testified that they smelled marijuana coming from the truck, a fact omitted from the arrest affidavit. *Id.* at 1224 n.5. Another officer said the odor came from her breath, while a fourth said it did not come from her breath but her "person." *Id.* at 1224. It was undisputed, however, that the officers — claiming an odor from the truck or her — never searched the truck for drugs, called a drug dog to confirm the presence or use of drugs, or did anything else to find any drugs. *Id.* at 1223. And, as explained above, later tests confirmed the plaintiff had not used drugs. *Id.* at 1225. Finally, the Eleventh Circuit noted that the officers did not interview

either any witnesses at the scene about the cause of the accident, even though the plaintiff told them the officer ran the light. *Id.* at 1224. They simply accepted their fellow officer's claim that the plaintiff ran the light. *Id.*

Based on this record, the Eleventh Circuit held the plaintiff presented evidence showing the officers "chose to either ignore or misrepresent [key] facts" provided to them, conducted their investigation "in a biased fashion," and "elect[ed] not to obtain easily discoverable facts." *Id.* at 1229. The Court further found that the plaintiff had raised a genuine issue of material fact that the officers did this to create the appearance of probable cause to protect their fellow officer. *Id.* at 1231. The Court found this evidence of intentional misconduct was enough to prevent qualified immunity. *Id.* at 1233. After all, no reasonable officer knowing of this misconduct could believe probable cause existed.

> [T]he facts support a conclusion that the arrest affidavit included recklessly or deliberately false statements that are material to a finding of arguable probable cause. If the defendants fabricated or unreasonably disregarded certain pieces of evidence to establish probable cause or arguable probable cause, as alleged, reasonable officers in the same circumstances and possessing the same knowledge as the defendants could not have believed that probable cause existed to arrest the plaintiff.

*Id.* at 1233.

Similarly, in *Gray v. City of Roswell*, the owner of a house removed a tenant's belongings, placed then in the tenant's truck, and covered them with a tarp. 486 F. App'x at 799–800. She then locked the tenant out of the house. *Id.* at 800. Police officers were called when the tenant tried to get back inside. *Id.* He claimed the owner had inflicted more than $5,000 in damages to his property and gave the officers a list of the damaged items. *Id.* The officers did not inspect the property and, in fact, knew that some of the property on the list was undamaged. *Id.* Still, they arrested the owner for criminal damage to property. *Id.*

The Eleventh Circuit held that — when faced with knowledge that some items on the tenant's list were undamaged — the officers had an obligation to conduct some further investigation. *Id.* at 801–02. They had information suggesting the tenant "was not providing 'reasonably trustworthy information'" which prevented them from relying on that information as the sole basis for probable cause. *Id.* at 802. More investigating was necessary. *See also Howard v. Gee*, 538 F. App'x 884, 890 (11th Cir. 2013) (holding arguable probable cause lacking when defendant "made little or no attempt to investigate the incident,"

accepted one party's statement, ignored another party's statement, and spoke with no identified witnesses); *Gray v. Ferdarko*, 982 F. Supp. 2d 1348, 1352–53 (N.D. Ga. 2013) (holding qualified immunity unavailable when officers "manufacture probable cause by solely considering the inculpatory evidence . . . while turning a blind eye to the exculpatory evidence").

These cases do not allow a district court to sit back with the benefit of hindsight and pontificate about what else investigating officers could have done, measuring their efforts by some amorphous standard of reasonableness as a prerequisite to qualified immunity. Rather, the caselaw explains that officers may not claim the protection of qualified immunity if they conduct a biased investigation, knowingly or recklessly rely on false information, or intentionally turn a blind eye to easily obtainable information that might challenge their judgment of probable cause.

Plaintiff presents no evidence Defendant Officers Ferguson or Silvers did any of that here. There is no evidence or allegation, for example, that the officers held any bias against Plaintiff or had any motive to bring charges against him. There is also no allegation or

evidence that they recklessly or deliberately relied on false information against Plaintiff. Plaintiff claims they should have tried alternative spellings of "Roderick" or "Rogers." That would have been a good idea. But Plaintiff provides no evidence the officers considered alternative spellings *at the time* and then turned a blind eye to the possibility of running them through RMS.

Plaintiff also claims the officers should have conducted a photo lineup, giving Ms. Carter a chance to see Plaintiff's photograph, and should have interviewed Plaintiff, giving him a chance to exonerate himself. But the College Park Police Department has several Standard Operating Procedures ("SOP") that provide officers with guidance on how to perform investigations. (Dkts. 59-27 ¶ 25; 68 ¶ 25.) One of the SOPs states that officers may identify suspects in many ways, including when a victim, such as Ms. Carter, knows the suspect. (Dkts. 59-27 ¶ 27; 68 ¶ 27.) The SOPs also provide that officers should avoid performing a show-up (that is, presenting a suspect to an eyewitness shortly after a crime) whenever possible given the suggestiveness of that practice. (Dkts. 59-27 ¶ 28; 68 ¶ 28.)

As for assault investigations, the SOPs provide that after interviewing the victim and considering any other available information, officers should determine the best plan, which may be an arrest if sufficient cause is found. (Dkts. 59-27 ¶ 29; 68 ¶ 29.) The SOPs state that "[o]nce suspects are identified, a warrant for their arrest should be obtained." (Dkts. 59-27 ¶ 30; 68 ¶ 30.) So, while one could say today that a photographic lineup would have been a good idea, the Department's SOPs explain why a reasonable officer would not necessarily do so as part of his investigation under these circumstances.

Plaintiff contends the dispute about whether Ms. Carter said her assailant ran a business on Riverdale Road or an auto body repair shop on Riverdale Road (as Defendant Officers claim) or that he sold t-shirts (as she stated in her declaration) prevents summary judgment. After all, Defendant Silvers testified that Ms. Carter's statement that her assailant ran a business on Riverdale Road was the "primary reason" he applied for the warrant. (Dkt. 78 at 26:5–8.) Defendants Ferguson and Silvers's claims to qualified immunity would be stronger if their testimony were undisputed. But, as explained in detail above, arguable probable cause existed even without this information. And there is no

allegation or evidence that Defendants Ferguson and Silvers recognized this discrepancy and intentionally ignored it so they could make a case against Plaintiff. The factual dispute, therefore, is immaterial and does not preclude summary judgment. *Rugendorf v. United States*, 376 U.S. 528, 532 (1964) (holding that disputed fact, being "of only peripheral relevancy to the showing of probable cause, and, not being within the personal knowledge of the affiant, did not go to the integrity of" the probable cause determination).

Both Defendant Officers testified that they believed they had probable cause to arrest Plaintiff, at the time and with the information they possessed. (*See, e.g.*, Dkt. 78 at 76:19–22 ("Q. And when you arrested Mr. Roderick Jermaine Rogers, . . . did you believe you had probable cause to arrest him? A.[Silvers] At the time, yeah.").) The Court finds Defendant Officers had at least arguable probable cause to arrest Plaintiff. Defendants then did not violate Plaintiff's constitutional rights and are thus entitled to qualified immunity on Plaintiff's federal malicious prosecution claim.

### b. Clearly Established Law

Even if Plaintiff could show Defendants Ferguson and Silvers violated his constitutional rights, he has failed to show the right was clearly established at the time of the alleged violation. To avoid summary judgment, Plaintiff must show that, at the time of the violation, the law gave Defendants fair warning that their alleged treatment of Plaintiff was unconstitutional.

A constitutional right is only clearly established for qualified immunity purposes if "every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks omitted) (alteration adopted). Put differently, "existing precedent must have placed the statutory or constitutional question beyond debate" to give the official fair warning that his conduct violated the law. *Id.*; *McClish v. Nugent*, 483 F.3d 1231, 1248 (11th Cir. 2007) ("The critical inquiry is whether the law provided [defendant officers] with 'fair warning' that [their] conduct violated the Fourth Amendment."). The Supreme Court has explained that the question is "whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." *See Saucier v.*

*Katz*, 533 U.S. 194, 202 (2001). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 202.

A plaintiff typically shows that a defendant's conduct violated clearly established law by pointing to "materially similar precedent from the Supreme Court, [the Eleventh Circuit], or the highest state court in which the case arose." *Gates*, 884 F.3d at 1296. While the facts of the case need not be identical, "the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau,* 642 F.3d 999, 1013 (11th Cir. 2011).

In *White v. Pauly*, the Supreme Court reiterated "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" 137 S. Ct. 548, 552 (2017) (quoting *al-Kidd*, 563 U.S. at 742). The Supreme Court held that to defeat a claim of qualified immunity, a plaintiff must "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment." *Id.* "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers." *Id.* (internal quotation marks omitted). "[T]he clearly established law must

be 'particularized' to the facts of the case," however. *Id.* The Supreme Court has also explained that avoiding qualified immunity does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

Fair warning can also arise from two other sources. First, "[a]uthoritative judicial decisions may 'establish broad principles of law' that are clearly applicable to the conduct at issue." *Gates*, 884 F.3d at 1296. Second, "it may be obvious from 'explicit statutory or constitutional statements' that conduct is unconstitutional." *Id.* at 1296–97. Regardless of the method, "the preexisting law must make it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010). In this way, qualified immunity does what it should: it "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks omitted) (alterations adopted).

There is no case from the U.S. Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court with similar factual circumstances that would have put Defendants Ferguson and Silvers on notice that it was unconstitutional to arrest Plaintiff based on the facts they had at the time. Nor has Plaintiff cited any precedential authority that would have made it obvious to the Officer Defendants that arresting an individual based on a name and physical description would violate Plaintiff's constitutional rights. *See Youmans*, 626 F.3d at 563.

The cases Plaintiff cites do not apply. He cites *Tillman v. Coley*, 886 F.2d 317 (11th Cir. 1989). But, in that case, the defendant sheriff arrested a woman named Mary Tillman after an undercover officer claimed to have bought drugs from a woman named Mary Tilma. *Id.* at 318. The sheriff admitted he knew Mary Tilman was forty-one and police had identified the suspect as in her twenties. *Id.* He further admitted that he had "serious doubts" about his identification of her but conducted no other investigation. *Id.* Indeed, he admitted that he arrested the plaintiff merely to identify her and not because he had sufficient probable cause to charge her. *Id.* at 319.

This case is nothing like that. Defendants Ferguson and Silvers had no doubts about the accuracy of their identification. To the contrary, they testified that they believed the description of Plaintiff was "spot-on" to Ms. Carter's description of her attacker. (Dkt. 59-27 ¶ 9; 68 ¶ 9.) *Tillman* would have put them on notice that they could not have arrested Plaintiff while seriously doubting their efforts to identify him. It also would have put them on notice they could not arrest Plaintiff merely to exclude him as the assailant. But that is not what happened here.

Plaintiff also cites *Daniels v. Bango*, a case in which an undercover deputy intentionally made false statements in his probable cause affidavit. 487 F. App'x 532, 538 (11th Cir. 2012). The Eleventh Circuit also found the defendant recklessly omitted material information when he did not include known inconsistencies in his arrest-warrant application. *Id.* at 539. The Court held that "when an officer possesses information that would cause a reasonable officer to have *serious doubts* about the identity of a suspect, the officer is required to take additional steps to confirm the suspect's identity before submitting the warrant application or include the contradictory information in the warrant application." *Id.* at 537 (quoting *Tillman*, 886 F.2d at 321). This record

contains no evidence that these Defendants made any deliberately false statements, recklessly omitted material facts, or had any doubts, let alone "serious doubts" about the identity of the suspect. *Daniels v. Bango* did not put Defendants on notice that their conduct would violate clearly established law.

No evidence shows Defendants Ferguson and Silvers were aware of any "red flags" that should have alerted them to the inaccuracy of their identification. No evidence suggests they knowingly included false information in the arrest warrant. Such a lack of evidence shows that each of Plaintiff's cited cases fails to put the "constitutional question beyond debate." *See Mullenix*, 136 S. Ct. at 308.

During oral argument, Plaintiff cited *Cozzi v. City of Birmingham*, 892 F.3d 1288 (11th Cir. 2018). That case could not have warned Defendants that their conduct in 2014 was clearly unlawful, as the Eleventh Circuit decided *Cozzi* years ***after*** Defendants Ferguson and Silvers mistakenly identified Plaintiff. And the officers in that case had and ignored "easily verifiable exculpatory information" — specifically, that the plaintiff had only one tattoo while the perpetrator was known to

have multiple visible tattoos. *Cozzi*, 892 F.3d at 1294. These Defendant Officers have no such "easily verifiable exculpatory information."

On the other hand, Defendants cite cases showing that mistaken arrests like the one at issue do not violate clearly established law. Defendants, for example, cite *Chapman v. City of Atlanta*, to counter Plaintiff's argument that — after Ms. Carter said her assailant sold t-shirts — they could not have arrested Plaintiff since they knew he ran an auto repair business. *See* 192 F. App'x 922, 924 (11th Cir. 2006). In *Chapman,* the Eleventh Circuit held that a mistaken arrest of a white female was reasonable even though the suspect was a black female. *Id.* at 923 ("The glaring inconsistency is that [the plaintiff] is white."). The Eleventh Circuit recognized that "in the face of many similarities, one material difference will not transform a reasonable arrest into an unreasonable one." *Id.* at 924. If a blatant discrepancy in an immutable characteristic such as race does not make an arrest unlawful, then a discrepancy in whether the suspect sold t-shirts or owned a business likewise does not.

Plaintiff has not shown that, at the time of the arrest, Defendants Ferguson and Silvers had fair warning that making an arrest based on a

name and a physical description alone would violate Plaintiff's constitutional rights. The Court thus holds Defendants Ferguson and Silvers are entitled to the protection of qualified immunity on the § 1983 malicious prosecution claim.

### c. Claims against Defendant Sergeant Ware and Defendant Lieutenant Patterson

Plaintiff asserts claims against Defendants Ware and Patterson but does not discuss their specific conduct in response to their motions for summary judgment. Perhaps Plaintiff believes they are somehow vicariously liable for the acts of Defendants Ferguson and Silvers.

Plaintiff presents no evidence Defendants Ware and Patterson knew of the manner by which the other officers identified Plaintiff as the man who assaulted Ms. Carter, knew they had not shown her a photo lineup, or were aware of the extent of their investigation (or lack thereof). They had no involvement with Ms. Carter's interview or the RMS search of "Roderick Rogers." (*See* Dkt. 78 at 34:19–35:1 (testifying that Silvers called Ware after Silvers ran Plaintiff's name and "I told him what I had, what she [Ms. Carter] told me, and what I found in the computer").)

The evidence viewed in the light most favorable to Plaintiff fails to establish either that Defendants Ware and Patterson violated Plaintiff's

constitutional rights or that their conduct violated clearly established law. They are entitled to qualified immunity.

### 2. Count III – First Amendment Retaliation Claim Against City of College Park

Plaintiff alleges that the City retaliated against him for filing his § 1983 claims by issuing municipal code citations against him. (Dkt. 67 at 21–22.) To prevail on a First Amendment retaliation claim, a plaintiff must prove three things: "first, that [plaintiff's] speech or act was constitutionally protected; second, that the [government actor's] retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Abella v. Simon*, 522 F. App'x 872, 874 (11th Cir. 2013) (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)).

Plaintiff satisfies the first element, as both the United States and Georgia Constitutions consider the filing of a lawsuit protected free speech. *See* GA. CODE ANN. § 9-11-11.1; *Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1357 (11th Cir. 2014). In weighing the second element, the Eleventh Circuit employs an objective standard to determine whether the alleged retaliatory conduct "would likely deter a person of ordinary

firmness." *Bennett*, 423 F.3d at 1254. Whether the plaintiff's First Amendment rights were "actually chilled" — a subjective question — is not relevant in this inquiry. *Id.* at 1251.

Plaintiff filed his complaint against the City on May 13, 2016. (Dkt. 67 at 8.) Five days later, Councilman Gay asked the City Code Enforcement Officer to "start [the] process to remove storage bin and derelict vehicle at business on Riverdale Drive." (Dkt. 72-4.) That afternoon, the officer issued Plaintiff a citation for a "derelict vehicle" on his car shop premises.[6] (Dkt. 59-19.)

Plaintiff alleges the City adversely affected his constitutionally protected speech by retaliatorily issuing him a citation. (Dkt. 67 at 21.) Given that Plaintiff already filed his complaint with this Court before he received any citation and has since continued to pursue it, however, the City's actions did not deter him. (*Id.* at 8–9.) The City therefore could not have adversely affected his protected speech. And there is no evidence in the record that a code citation would deter a person of

---

[6] The City ultimately dismissed this citation because Ms. Porter incorrectly cited a code section not intended for auto repair shops. (Dkt. 59-1 at 10.)

ordinary firmness from filing a complaint. Even if this Court used a subjective standard in weighing this element, Plaintiff cannot show issuing the citation adversely affected him since he later filed an amended complaint to include this count against the City. (Dkt. 17 ¶ 74.) Plaintiff points to no evidence creating a material fact about whether the City's actions deterred him from exercising his First Amendment rights.

Plaintiff also fails to establish the third element of a First Amendment retaliation claim: a causal connection between his complaint and the later citations he received from the City. To satisfy this element, a plaintiff must show that "the defendant was subjectively motivated to take the adverse action because of the protected speech." *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011). If the plaintiff accomplishes this, the burden shifts to the defendant to show that he "would have taken the same action in the absence of the protected conduct." *Id.* If the defendant meets this burden, the law protects him from liability. *Id.*

Plaintiff alleges the City had some subjective motivation to issue him a citation because of the complaint he filed against it. (Dkt. 67 at 21.) Plaintiff believes that Councilman Gay ordered the code

enforcement officer to issue the citation after learning of Plaintiff's complaint. (*Id.* at 21–22.) No evidence supports this allegation. The record contains no evidence Councilman Gay knew about the lawsuit when he asked the enforcement officer to start removing vehicles. Councilman Gay testified that he did not know of Plaintiff's lawsuit until a City Council Executive Session on June 6, 2016, more than two weeks after he spoke with the enforcement officer. (Dkt. 72-1 at 34:16–18.) Additionally, Mr. Oscar Hudson, the enforcement officer's supervisor who allegedly directed her to issue the citation, testified that he did not know about the complaint until the City's attorneys contacted him — long after the officer issued the citation. (Dkt. 74 at 56:18–24.)

Plaintiff seeks to raise an issue of fact by pointing to Councilman Gay's testimony that he "just can't remember" exactly when he learned of the lawsuit. (Dkt. 67 at 22.) But he does remember that he first learned of the lawsuit during a City Council executive session. (Dkt. 72 at 71:2–8.) City documents show that the first Executive Session after the City Attorney received notice of the suit occurred on June 6, 2016 — 19 days after Plaintiff's May 18th code citation. (Dkts. 59-27 ¶ 43; 68 ¶ 43.) Plaintiff points to no evidence to call this timeline into question.

Plaintiff also cites no evidence that Councilman Gay ordered the enforcement officer to issue a citation on Plaintiff's business. The evidence shows that he merely asked her to "start [the] process to remove storage bin and derelict bin at business on Riverdale Drive." (Dkt. 72-4.) The officer, unaware of the lawsuit, acted within her own discretion in issuing Plaintiff a citation. (Dkt. 72-1 at 49:18–25.)

Plaintiff further contends there is a causal connection between his complaint and the citation he received five days later, arguing that there is "close temporal proximity" between these events. (Dkt. 67 at 23.) "[T]emporal proximity is relevant to proving causation." *Stallworth v. Tyson*, 578 F. App'x 948, 951 (11th Cir. 2014). It is not, however, dispositive. No evidence in this case suggest Councilman Gay ordered the citation or even knew about the complaint when the officer issued the citation. Without evidence the City acted *because of* his complaint, the mere temporal proximity cannot satisfy Plaintiff's burden of showing the City's subjective motivation for adverse action.

Even if Plaintiff could meet this burden, the City has shown that it would have taken the same action without the protected complaint. The citations Plaintiff received on May 18, 2016, and afterwards were

legitimate and stemmed from Plaintiff's continued noncompliance with the City's code. (Dkt. 59-1 at 10–12.) Plaintiff has a history of code violations, something Councilman Gay testified as a "really long-term issue." (Dkt. 72-1 at 60:23–24.) This history, along with Plaintiff's continued noncompliance, shows that the City would have issued this citation regardless of Plaintiff filing his complaint. Plaintiff thus fails to raise an issue of material fact as to the third requirement of a First Amendment retaliation claim.

Because the City shows a lack of evidence to support Plaintiff's First Amendment retaliation claim and Plaintiff has not provided specific facts to create a genuine issue of material fact for trial, the Court grants the City summary judgment on this count.

### B. State-Law Claims & Municipal Immunity

#### 1. Negligence Claim Against Defendant City of College Park

Plaintiff asserts a negligence claim against Defendant City of College Park. (Dkt. 17 ¶¶ 75–82.) He claims that because the City maintained a liability insurance policy that provides coverage and indemnification for liability arising from its operation of the police department, the City waived its sovereign immunity. (*Id.* ¶ 77.) Plaintiff

argues the City may be held liable for the negligence of its police officers. (Dkt. 67 at 23.)

Under Georgia law, the official immunity of a city employee does not implicitly protect the city from tort liability. *See Gilbert v. Richardson*, 452 S.E.2d 476, 484 (Ga. 1994). Municipalities instead can invoke sovereign immunity (also called "municipal immunity") against tort claims. *Barton v. City of Rome*, 610 S.E.2d 566, 568 n.2 (Ga. Ct. App. 2005). The city, however, "may be liable for a [city] employee's negligence in performing an official function to the extent [it] has waived sovereign immunity." *Gilbert*, 452 S.E.2d at 484. A municipality waives its sovereign immunity by buying liability insurance if the "policy of insurance issued covers an occurrence for which the defense of sovereign immunity is available, and then only to the extent of the limits of such insurance policy." GA. CODE ANN. § 36-33-1(a). "The party seeking to benefit from the waiver of sovereign immunity has the burden of proof to establish waiver. . . ." *Murray v. Ga. Dep't of Transp.*, 644 S.E.2d 290, 293 (Ga. Ct. App. 2007).

Defendant's municipal liability insurance policy contains the following provision:

> Because you are a public institution, you may be entitled to governmental immunity. This policy does not constitute a waiver of any governmental immunity to which you are entitled.

(Dkt. 86-1 at 5.) Georgia courts have not addressed non-waiver provisions in municipal insurance policies. Other states, however, have analyzed this type of language and found that municipalities do not waive their immunities when their insurance policies contain similar non-waiver provisions. *See Langley v. Curators of Univ. of Mo.*, 73 S.W.3d 808, 811 (Mo. Ct. App. 2002).

In the context of a medical malpractice case, the Missouri Court of Appeals held that a self-insurance plan did *not* waive sovereign immunity when the plan contained a waiver that made clear "nothing in this Plan shall be construed as a waiver of any governmental immunity of the Employer, the Board of Curators of the University of Missouri nor any of its employees in the course of their official duties." *Id.* (alterations adopted). The court explained that "[a] public entity does not waive its sovereign immunity by maintaining an insurance policy where that policy includes a provision stating that the policy is not meant to

constitute a waiver of sovereign immunity." *Id.*; *see also Hammer v. City of Osage Beach*, 318 F.3d 832, 841 (8th Cir. 2003) (finding city's insurance policy contained language expressly limiting city's liability beyond specific statutes); *Wright v. Gaston Cty.*, 698 S.E.2d 83, 89 (N.C. Ct. App. 2010) (holding plaintiff's claim barred by insurance provision stating that statutory and common law immunities were not waived); *Lunsford v. Renn*, 700 S.E.2d 94, 100 (N.C. Ct. App. 2010) (granting summary judgment for defendant when insurance policy made clear it did not waive governmental immunity).

Plaintiff alleges that whether Defendant waived sovereign immunity by buying liability insurance creates a disputed issue of fact. *See Gray v. Ector*, 541 F. App'x 920, 926 (11th Cir. 2013) (reversing grant of summary judgment because disputed issue of fact about whether an insurance policy covered an occurrence and therefore waived city's sovereign immunity). This case, however, is distinguishable because Defendant's insurance policy contains an express non-waiver provision, while the insurance policy in *Gray* did not. This is the expected result because "sovereign immunity is not an affirmative defense that must be established by the party seeking its protection. To the contrary,

immunity from suit is a privilege that is subject to waiver by the State, and the waiver must be established by the party seeking to benefit from the waiver." *Fulton Cty. Sch. Dist. v. Jenkins*, 820 S.E.2d 75, 77 (Ga. Ct. App. 2018) (internal quotation marks and citation omitted).

Defendant preserved its sovereign immunity through the purchase of liability insurance because the policy included an express non-waiver provision. *See* GA. CODE ANN. § 36-33-1(a) (authorizing a municipality to waive its sovereign immunity by buying liability insurance if the "policy of insurance issued covers an occurrence for which the defense of sovereign immunity is available, and then *only to the extent of the limits of such insurance policy*" (emphasis added)). The insurance policy itself limited the waiver of sovereign immunity, as contemplated by § 36-33-1(a).

The City of College Park thus has not waived its sovereign immunity and remains immune from tort liability. The Court finds that no genuine issue as to any material fact exists on this issue and grants Defendants summary judgment on Count IV.

**IV. Conclusion**

The Court **GRANTS** Defendants' Motion for Summary Judgment

(Dkt. 59).

**SO ORDERED** this 3rd day of September, 2019.


_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE